# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

**United States of America,**

Plaintiff,

v.

**Apprentiace Singletary,**

Defendant.

**REPORT and RECOMMENDATION**

23-cr-6134-FPG-MJP

---

## APPEARANCES

**For the United States:**     **Matthew T. McGrath, Esq.**
Assistant U.S. Attorney
U.S. Attorney's Office
100 State St
Rochester, NY 14614

**For Defendant:**     **Joseph S. Damelio, Esq.**
125 State St
Rochester, NY 14614

## INTRODUCTION

**Pedersen, M.J.** Wearing a mask does not immunize a wanted person from a valid arrest warrant. Here, law enforcement properly executed an arrest warrant for Defendant Apprentiace Singletary. Singletary cannot argue that his arrest was unreasonable under the Fourth Amendment because he was not identifiable. Whatever means law enforcement used, they arrested Singletary—not someone else. That remains true no matter what Singletary was wearing: mask, hoodie, or

1

other nondescript clothing. His arrest is therefore a reasonable seizure under the Fourth Amendment. And while Singletary has protested, his protests are based on cases involving *warrantless* arrests.

During a valid search incident to arrest, law enforcement recovered guns. Singletary is a felon. He does not dispute this. But when the Grand Jury indicted him under 18 U.S.C. § 922(g)(1), he moved to dismiss the indictment. Singletary argues that the Supreme Court's 2022 decision in *New York State Rifle & Pistol Association v. Bruen* invalidates Section 922(g)(1). For the same reasons that every other trial court in this Circuit has disagreed with this conclusion, I also disagree.

Finally, Singletary argues that the Court should suppress un-*Mirandized* statements he made after law enforcement arrested him and was searching his bags. I agree with Singletary that some of his statements should be suppressed. While in custody, United States Marshal's Service deputies, ("USMS"), or other members of the Fugitive Task Force asked Singletary questions they should have known were reasonably likely to elicit an incriminating response. But Singletary—as has been his wont in open court—blurted out admissions that I find should not be suppressed.

For these reasons and those below, I report and recommend that the Hon. Frank P. Geraci, Jr., Senior District Judge, **DENY** Singletary's motion to dismiss his indictment, **DENY** Singletary's motion for

suppression of evidence, and **GRANT IN PART and DENY IN PART** his motion to suppress statements.

## BACKGROUND

The Government charged Singletary with violating 18 U.S.C. § 922(g)(1), the felon-in-possession statute. (Compl., ECF No. 1, Feb. 14, 2023.) Since being charged, Singletary has gone through a string of attorneys: Wedade Wendy Abdallah, Esq.; David C. Pilato, Esq.; Matthew R. Lembke, Esq., and now I have appointed Joseph S. Damelio, Esq., as Singletary's counsel.[1] Each of these attorneys are capable members of this Court's bar. Unfortunately, most did not meet Singletary's expectations.

---

[1] While we are not at this point, I note that if Singletary continues to fire his attorneys, he may waive his right to counsel. *See, e.g., United States v. Nichols*, 77 F.4th 490, 500 (7th Cir. 2023) ("A defendant has no right to indefinite delays while he tries on new lawyers unless he has a valid reason for dissatisfaction with the old." (quoting *United States v. Oreye*, 263 F.3d 669, 671 (7th Cir. 2001)) (cleaned up)); *United States v. Capistrano*, 74 F.4th 756, 775 (5th Cir.) (holding that where defendant "persistently and unreasonably demanded that her counsel be dismissed[,]" the trial court did not err in forcing the defendant to proceed *pro se* because "[a]fter having already dismissed multiple attorneys and [after] refusing to cooperate and communicate" with counsel," her actions "relinquished her right to counsel" (alterations added and citation omitted)) (additional subsequent procedural history omitted), *cert. denied*, 144 S. Ct. 516 (2023). Before such a waiver, however, I should provide Singletary with notice and the opportunity to be heard. *See United States v. Frankel*, 589 F.3d 566, 568 (2d Cir. 2009) (noting that finding of waiver of right to counsel "should have been preceded by notice to [the defendant] and an opportunity to be heard" (alteration added and citation omitted)).

While Singletary was dismissing his attorneys, the government indicted him on July 20, 2023. (ECF No. 15.) Despite Singletary's misgivings, the Grand Jury found probable cause to believe that he has violated the felon-in-possession statute.

### *Judge Geraci issues an arrest warrant for Singletary and U.S. Marshals apprehend him.*

When the Hon. Frank P. Geraci, Jr., Senior District Judge, learned that Singletary had violated the terms of his supervised release, he issued an arrest warrant in November 2022. Acting on that warrant, USMS pursued Singletary from December 2022 to January 2023. But Singletary had left Rochester; USMS was unable to locate him.

In early February 2023, USMS learned—in part through surveillance of Singletary's social media—that he would be returning to Rochester on a Greyhound bus. USMS determined that Greyhound sold a ticket in Singletary's name.

USMS and other Task Force officers arrested Singletary a short distance from the Greyhound Bus Station in downtown Rochester. Law enforcement found weapons: two pistols in one of Singletary's bags.

### *Singletary is a felon.*

No one disputes that Singletary is a felon; Singletary has not disputed that status. Singletary's most recent felony conviction, like the charge pending before me, involves a weapon: Singletary pled guilty to brandishing a firearm during a drug trafficking crime under 18 U.S.C.

§ 924(c)(1)(A)(ii). (Aff. in Support of Compl. ¶ 8(a), ECF No. 1.) Singletary has separate state felony convictions including bribery and criminal possession of stolen property. (*Id*. ¶¶ 8(b) & (c).) No surprise, the government charged him under the felon-in-possession statute.

### *The government charges Singletary for being a felon in possession of a firearm under 922(g)(1).*

The government charged Singletary with one charge under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm and ammunition. (Compl. at 1 & Aff. in Support ¶ 3, ECF No. 1.) Singletary first appeared before me on February 16, 2023. (Minute Entry, ECF No. 4.) Because of a related proceeding stemming from Singletary's violations of supervised release (for which the arrest warrant was issued), Judge Geraci ordered Singletary detained. (Minute Entry, ECF No. 6, Feb. 21, 2023.)

### *The Government indicts Singletary.*

The case proceeded unindicted for several months. During this time, I appointed two new attorneys for Singletary. (Minute Entry, ECF No. 8, May 19, 2023; Minute Entry, ECF No. 10, June 20, 2023.)

During his second-most-recent attorney's tenure, the Grand Jury indicted Singletary. (ECF No. 15, July 20, 2023.) Anticipating the pending omnibus motion, Judge Geraci referred this case to me for pretrial motions and a report and recommendation. (Text Order, ECF No. 17, July 20, 2023.)

***After being indicted, Singletary moves to dismiss the indictment and to suppress evidence.***

Singletary moved to dismiss the indictment and suppress evidence. (ECF No. 32, Nov. 28, 2023.) Singletary argues the District Court should grant his motion to dismiss the indictment because 18 U.S.C. § 922(g)(1) is unconstitutional. (Mem. of Law, ECF No. 32-2, Nov. 28, 2023.) Singletary simultaneously moved to suppress evidence, including officers' identification of him and the weapons they recovered from him. (Aff. of Matthew Lembke, Esq., ECF No. 32-1.)

***I order Singletary removed from the courtroom and take steps to ensure courtroom safety at his next appearance.***

Throughout the proceedings before me, I have found Singletary unpredictable. He frequently interrupts court proceedings.

During argument before me on the pending omnibus motion, I ordered Singletary removed from my courtroom. (Minute Entry, ECF No. 36, Dec. 21, 2023.) I memorialized my reasoning and the events of the oral argument in an order filed the same day. (ECF No. 37.)

I ordered, *first*, that Singletary remain handcuffed at a follow-up hearing to the December 21 oral argument. Singletary had threatened the Assistant United States Attorney prosecuting this case. *Second*, I notified Singletary that he will be removed from all future proceedings before me if he does not conduct himself consistently with the decorum and respect inherent in judicial proceedings. And *third*, I noted that I would ask Singletary at the beginning of future hearings if he will

6

conduct himself appropriately. I noted that if he does not answer "yes," that I may order him removed. (*Id.* at 6.)

### *Singletary opts not to proceed* **pro se.**

After issuing my order, I did not hear from Singletary again until his attorney moved to withdraw in late January. (ECF No. 39, Jan. 23, 2024.) That attorney, Mr. Lembke, advised me that Singletary wished to proceed *pro se* in his case.

Singletary appeared before me to talk about proceeding *pro se*. (Minute Entry, ECF No. 40, Jan. 25, 2025.) He answered most of the questions I posed, but I was not able to finish the colloquy. (*Id.*) Ultimately, Singletary did not want to be unrepresented in this case. (*Id.*) Yet he has also taken the stance that unless his attorneys do what he wants them to do, he will keep firing them. As I noted above, if Singletary continues this pattern of conduct, he may waive his right to counsel.

With a new attorney on the case, I held an evidentiary hearing on February 29, 2024. (Minute Entry, ECF No. 43.) After that hearing, I gave the parties the opportunity for post-hearing briefing since Singletary's attorney had only just come onto the case. The parties filed post-hearing briefing, completing all briefing by May 3, 2024. (ECF No. 47 (Singletary's post-hearing submission); ECF No. 48 (Singletary's supplemental post-hearing submission); ECF No. 49 (the government's

response).) I then took this matter under advisement to issue my report
and recommendation.[2]

## CONSTITUTIONAL CHALLENGE

Singletary moves to dismiss the indictment on the grounds that
section 922(g)(1) is unconstitutional. He relies primarily on *New York
State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). I construe
his challenge as a facial one.[3] His challenge fails.

-----

[2] In making this report and recommendation, in addition to the documents noted herein, I have reviewed the government's hearing exhibit 1, body worn camera footage in the immediate aftermath of Singletary's arrest and a letter that Singletary wrote to me dated May 6, 2024. (ECF No. 50, May 16, 2024.)

[3] During oral argument on the omnibus motion, I queried Singletary about which avenue—as-applied or facial—he was arguing. Singletary's counsel told me he is making a facial challenge. Yet the language Singletary himself and his attorney used during oral argument suggested an as-applied challenge.

No matter. Even if I considered Singletary's challenge as-applied, I would reject it because Singletary does not dispute his felony convictions. *See United States v. Baker*, No. 23-CR-6087CJS, 2023 WL 5511343, at *3 (W.D.N.Y. July 12, 2023) (rejecting as-applied challenge where it was "clear that" the defendant's "conviction was 'punishable by imprisonment for a term exceeding one year,'" and thus fell in the ambit of Section 922(g)(1) (quotation omitted)), *report and recommendation adopted*, No. 23-CR-6087 CJS/MWP, 2023 WL 5510401 (W.D.N.Y. Aug. 25, 2023). Chief Judge Wolford recently reached a similar conclusion. *See United States v. Rodriguez*, No. 23-CR-6173 EAW, 2024 WL 1363680, at *3 (W.D.N.Y. Apr. 1, 2024) (holding that Defendant's as-applied challenge must fail "given that Defendant does not dispute his prior felony convictions and has offered no other basis on which an as-applied challenge could succeed").

*The applicable legal standard involves discussion of recent Supreme Court jurisprudence.*

**The Supreme Court decides *Heller, McDonald*, and *Bruen*.**

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. This right gives the citizens "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

But *Heller* only invalidated a District of Columbia law that "totally ban[ned] handgun possession in the home." *Id*. at 628 (alteration added). The right to "bear arms" outside of the home remained undecided until *Bruen*. Likewise, *Heller* did not decide if the Second Amendment should be incorporated against the states.

Several years later, the Supreme Court incorporated the Second Amendment against the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). There, the Court invalidated several municipal statutes that banned handguns in homes. *See id*. at 749–50.

Finally, in *New York State Rifle & Pistol Association, Inc. v Bruen*, the Supreme Court recognized the right to bear arms outside of the home: "consistent with *Heller* and *McDonald*, [ ] the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10 (alteration added). The

Second Amendment now applies to permit "the people" to keep and bear arms inside and outside of the home.

### *Heller*, *McDonald*, and *Bruen* unambiguously state that the right to keep and bear arms is not unlimited.

Despite the right to keep and bear arms inside and outside the home, the Supreme Court has unambiguously stated that Second Amendment rights are "not unlimited." *Heller*, 554 U.S. at 595; *McDonald*, 561 U.S. at 786 ("It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" (quoting *Heller*, 554 U.S. at 626)).

The Court has accordingly taken pains to reiterate that "nothing" in its Second Amendment decisions "should be taken to cast doubt on" well-established "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626–27. Such presumptively lawful regulatory measures include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *Id*. at 554, 626–27; *see also McDonald*, 561 U.S. at 786 (endorsing the *Heller* "assurances")).

**Bruen calls for a new test.**

After *Heller* and *McDonald*, lower courts developed tests to determine the constitutionality of laws implicating the Second Amendment. Courts in this circuit would first "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment[,]" and second, they would determine "the appropriate level of scrutiny to apply and evaluate the constitutionality of the law using that level of scrutiny." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018) (alteration added). The Supreme Court rejected the second step of this analysis in *Bruen*.

The Supreme Court decided as much despite courts' expertise in applying means-ends scrutiny: "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 597 U.S. at 19. "In keeping with *Heller*," the Court in *Bruen* "essentially remove[d] the second step—the means-ends balancing—from the inquiry," making the focus on "textual and historical analysis alone." *United States v. Hampton*, 676 F. Supp. 3d 283, 298 n.15 (S.D.N.Y. 2023) ("Despite the popularity of this two-step approach, it is one step too many." (citation omitted) (quoting *Bruen*, 597 U.S. at 19)).

The *Bruen* Court replaced the test courts had developed based on *Heller* and *McDonald* with a new analysis of text, history, and tradition:

> The standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively

> protects that conduct. The government must then justify
> its regulation by demonstrating that it is consistent with
> the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24. The Court then indicated that historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 30 (emphasis in original). Critically, "modern regulations that were unimaginable at the founding" need only be "relevantly similar" to an historical analogue. *Id*. at 28–29. Courts have thus reasoned that legislatures have "discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people 'to an orderly society and compliance with its legal norms,' not merely to address a person's demonstrated propensity for violence." *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (discussing *Range v. Att'y Gen. United States*, 53 F.4th 262, 281–82 (3d Cir. 2022)). Such legislative determinations warrant judicial respect. *See id*. at 504 (noting that "legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed"). Because the Second Circuit has binding precedent on point, however, I will not proceed with an analysis of text, history, and tradition under *Bruen*.

***I reject Singletary's motion to dismiss under controlling Second Circuit precedent.***

I am bound by *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013). There, the Second Circuit upheld the constitutionality of Section 922(g)(1) considering *Heller* and *McDonald*. The Court "turned what might be "characterize[d] as 'dicta' in *Heller* and *McDonald* into binding precedent." *Hampton*, 676 F. Supp. 3d at 301. The Second Circuit held based exclusively on the felon-in-possession language in *Heller* and *McDonald* that Section 922(g)(1) is constitutional. *See Bogle*, 717 F.3d at 281–82 ("Section 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons."). The Second Circuit reasoned that in *Heller* and *McDonald* "the Supreme Court clearly emphasized that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Id*. at 281 (quoting *Heller*, 554 U.S. at 626).

*Bogle* thus does not rest on the means-end analysis that the Supreme Court rejected in *Bruen*. Because it rests instead on the language in *Heller* and *McDonald*, I find that it is binding. *See Hampton*, 676 F. Supp. 3d at 301 ("With *Heller* and *McDonald* still in full force after *Bruen*, *Bogle* remains binding precedent within this Circuit on the constitutionality of [S]ection 922(g)."); *Baker*, 2023 WL 5511343, at *3.

To my knowledge, no trial court in this circuit or district has concluded otherwise. *See, e.g., United States v. Grant*, No. 3:22-CR-00179 (KAD), 2024 WL 1798172, at *3 (D. Conn. Apr. 25, 2024) (collecting cases) ("*Bruen* did not disturb the precedents upon which *Bogle* relies and *Bogle* therefore remains binding upon this Court. The Court now joins the chorus of other district courts in this Circuit which have so held."); *United States v. Glover*, No. 23-CR-69 (JLS) (JJM), 2024 WL 1714908, at *1–2 (W.D.N.Y. Apr. 22, 2024) (adopting report and recommendation that denied the defendant's motion to dismiss based on *Bogle*); *Rodriguez*, 2024 WL 1363680, at *2 (Wolford, C.J.) (finding *Bogle* binding "like every other district court in this Circuit to have faced this question to date" (quoting *United States v. Pickett*, No. 1:22-CR-00486, 2024 WL 779209, at *3 (E.D.N.Y. Feb. 26, 2024))). I accordingly report and recommend that Judge Geraci, deny Singletary's motion to dismiss the indictment on constitutional grounds.

### *In any event, the Supreme Court appears poised to uphold the "reasonable restrictions" language in* Heller *and* McDonald.

Were that not enough, a Supreme Court majority appears poised to uphold cases like *Bogle*. *See Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) (noting that "six of the nine Justices pointed out that *Bruen* was not casting any doubt on" *Heller*'s language about convicted felons). Justice Kavanaugh, joined by Chief Justice Roberts, concurred in *Bruen*. He approvingly quoted *Heller*'s language that felon-possession

14

prohibitions are "presumptively lawful" under *Heller* and *McDonald*. *Bruen*, 597 U.S. at 80–81 ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 626–27)). While the Supreme Court could reverse course in deciding related cases such as *United States v. Rahimi*, which deals with Section 922(g)(8), the Supreme Court seems to have intimated that—for now— Section 922(g)(1) is constitutional.

And as the Tenth Circuit noted in *Vincent*, the *Bruen* Court "apparently approved the constitutionality of regulations requiring criminal background checks before applicants could get gun permits." *Vincent*, 80 F.4th at 1201. The Tenth Circuit added: "In preserving 'shall-issue' regimes and related background checks, the Court arguably implied that it was constitutional to deny firearm licenses to individuals with felony convictions. *Bruen*'s language thus could support an inference that the Second Amendment doesn't entitle felons to possess firearms." *Id.* at 1202; *see also Jackson*, 69 F.4th at 502; *but see Atkinson v. Garland*, 70 F.4th 1018, 1022–23 (7th Cir. 2023) ("Since oral argument, the government has also urged us to conclude, without any historical analysis, that the plain text of the Second Amendment does not cover felons … *Bruen* left this complicated issue unresolved." (citation omitted)). Because a majority of the Supreme Court has upheld Section

15

922(g)(1), I likewise reject Singletary's argument and report and recommend that the Judge Geraci reject Singletary's constitutional challenge.

## SUPPRESSION OF IDENTIFICATION

"[B]ecause a warrant generally authorizes no more than what it expressly provides, to act unreasonably beyond the terms of a warrant is akin to acting without a warrant at all." *Simon v. City of New York*, 893 F.3d 83, 94 (2d Cir. 2018) (alteration added). Officers may unreasonably seize a person if the person seized is not the person named in the warrant. *See id.* (quoting U.S. Const. amend. IV). To evaluate such questions, the Second Circuit directs courts to "look directly to the text" of a warrant to evaluate the scope of the authority that it grants. *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2012) (discussing search warrants). "Under this principle, a warrant authorizing the arrest of one person does not authorize the seizure of someone with a similar name." *Simon*, 893 F.3d at 94–95. But that is not what happened here.

Singletary *was* the person named in the warrant. Judge Geraci issued an arrest warrant for USMS to apprehend Singletary. So, USMS apprehended Singletary. Whatever means USMS used—or risks they took that they might arrest the wrong person—they arrested *Singletary*. Not someone else. On this record, I must conclude that USMS executed the warrant reasonably under the Fourth Amendment. I thus report and

recommend that Singletary's motion to suppress evidence against him be denied.

Yet Singletary questions how USMS could have identified him because he was wearing a ski mask and lacked other unique characteristics. I reject this argument for several reasons.

To begin, USMS was familiar with Singletary from earlier interactions. (Hr'g Tr. 22:16–24:22, ECF No. 44, Mar. 18, 2024 ("Tr."); Tr. 55:2–56:3; Gov't's Hr'g Ex. 1 ("Ex.").[4] And USMS deputies stated that they were familiar with Singletary's physical appearance, so they were able to identify him in court. (Tr. 24:3–22, 63:3–12; *see also* Tr. 83:7–16 (state law enforcement officer also able to identify Singletary).) And USMS knew that "there was a ticket purchased in his name or in the name of Apprentiace Singletary and that the bus would be returning to Rochester on February 8th." (Tr. 25:23–25.) With knowledge of his appearance, and ticket purchase, USMS deputies had little trouble locating Singletary after he left the bus station and began "walking southbound on Clinton Ave in the direction of Cumberland Street." (Tr. 28:2–3.)

Still, Singletary asserts that "the police were required to have probable cause to believe that the person they were arresting was the

---

[4] Because only the government submitted exhibits, the lone exhibit that the government submitted will be referred to as "Ex. 1."

right person—and they did not have it." (Lembke Aff. ¶ 45, ECF No. 32-1.[5]) Not so.

Even in cases involving homes—and Singletary was not in his home or someone else's when he was arrested—law enforcement does not need probable cause when executing an arrest warrant. *See United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999) ("[I]n order to authorize entry into a person's home to execute a warrant for his arrest, the officers' belief that the residence to be entered is the home of the person named in the warrant need not be supported by probable cause … Nor need the officers' belief, if reasonable, be correct." (alterations added)). The Fourth Amendment does not require that officers have probable cause that the person named in the warrant is the person they are arresting.[6] Instead, a person wrongly seized by law enforcement has a cause of action under *Bivens* for monetary damages. *See Hernandez v. Mesa*, 589 U.S. 93, 99 (2020) (alteration added) ("In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 [(1971)], the Court broke new ground by holding that a person claiming to be the victim of an unlawful arrest and search could

---

[5] Singletary makes similar assertions in a letter sent to me in May 2024.

[6] True, to search a residence officers need reasonable suspicion. *See Lovelock*, 170 F.3d at 343. But, again, Singletary was arrested in public.

bring a Fourth Amendment claim for damages against the responsible agents even though no federal statute authorized such a claim.").[7]

This is so that law enforcement officers are not saddled with the task of confirming suspects' identities before arresting them. Our system of justice has determined that the appropriate remedy for a case of mistaken identity is monetary damages. This is sensible. Imposing a burden of identification on law enforcement officers would be too high an *ex ante* cost when officers need to make split-second decisions about apprehending suspects. To do otherwise would invite the kind of mask-wearing Singletary believes should immunize him, preventing otherwise valid arrests.

Singletary cites a litany of cases involving warrantless arrests. These cases are irrelevant. When law enforcement officers have a warrant and apprehend the subject of that warrant in a public place, like they did here, the Court does not ask if they had reasonable suspicion, probable cause, or positive identification. As discussed, the Court asks whether the officers executed the warrant reasonably. The officers here

---

[7] Notably, even if Singletary were bringing a *Bivens* claim, it would fail because his arrest was correctly "effectuated pursuant to a warrant[.]" *Little v. City of New York*, 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007) (citation omitted) ("Where an individual's arrest is effectuated pursuant to a warrant, there can be no claim for false arrest or unlawful imprisonment.").

executed a warrant and arrested the person named in it. The Fourth Amendment requires nothing more of them.

## SUPPRESSION OF STATEMENTS UNDER *MIRANDA*

Singletary next moves to suppress statements he made "after his unlawful arrest … because they were the result of custodial interrogation which was not preceded by … *Miranda* warnings." (Lembke Aff. ¶ 49, ECF No. 32-1.) The government does not dispute that Singletary was in custody under *Miranda*. Rather, the government asserts that Singletary's statements "about having firearms in a bag" in his possession were "in response to a question reasonably prompted by a concern for public safety and the officers' safety." (Response at 8, ECF No. 35, Dec. 15, 2023.) I disagree. I do find, however, that many of Singletary's other statements are admissible.

And, separately, I note that recovery of the guns Singletary had falls well within the bounds of search incident to arrest. *See Illinois v. Lafayette*, 462 U.S. 640, 644 (1983) ("[I]mmediately upon arrest an officer may lawfully search the person of an arrestee … he may also search the area within the arrestee's immediate control." (alterations added) (citing *Chimel v. California*, 395 U.S. 752 (1969))); *see also McCardle v. Haddad*, 131 F.3d 43, 49 (2d Cir. 1997)) (noting that "an area search incident to a lawful arrest is, by reason of the arrest, lawful regardless of whether the officer has any subjective fear or suspicion as to the presence of weapons" (citing *United States v. Robinson*, 414 U.S. 218, 235–

36 (1973))). I thus find no basis to exclude the guns found in Singletary's possession.

### The Government bears the burden of showing that exceptions to Miranda apply here.

"To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first" providing several familiar warnings. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). Officers must warn the defendant that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Id*. (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "If a suspect is not so warned, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief." *Id*. (citations omitted).

Given the importance of *Miranda*, courts in this circuit hold that the government bears the burden of establishing a *Miranda* exception. "Where a defendant 'has alleged police custodial interrogation in the absence of Miranda warnings, the burden shifts to the government to prove Miranda voluntariness, either because there was no custodial interrogation implicating Miranda, there was some exception to the Miranda rule, or because [the defendant] was properly Mirandized and waived his

rights.'" *United States v. Medina*, 19 F. Supp. 3d 518, 537 (S.D.N.Y. 2014) (alteration in original) (quoting *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005)).

Because Singletary raised sufficient issues of fact regarding whether the marshals arresting him provided him with *Miranda* warnings, I held a hearing on the matter. (Singletary Aff. ¶¶ 22–25, ECF No. 34, Dec. 6, 2023.) The government asserted that Singletary's statements fall within an exception to *Miranda*:

> As evidenced through testimony at the hearing, the defendant made statements to law enforcement while he was in custody, but these statements were not made in response to custodial interrogation. The defendant's initial statement about having firearms in a bag was in response to a question reasonably prompted by a concern for public safety, the defendant's safety, and the officers' safety.

(Response at 7, ECF No. 49 (citations omitted).) The government concedes that Singletary was in custody and that USMS deputies' questions qualify as interrogation. Even if that were not so, as I explain below, I would find the questions USMS asked were reasonably likely to elicit an incriminating response—something that USMS deputies would be aware of.

### *The public safety exception requires an objectively reasonable need to protect the police or the public.*

Under the public safety exception, "*Miranda* warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of the arresting officers for a suspect's answers

22

to be admitted as evidence of his guilt." *Newton*, 369 F.3d at 677 (internal quotation marks omitted) (quoting *New York v. Quarles*, 467 U.S. 649, 656 (1984)). The exception "does not depend upon the subjective motivation of the questioning officer." *Id.* (cleaned up). "Rather, it applies so long as the questioning relates to an objectively reasonable need to protect the police or the public from any immediate danger." *Id.* (cleaned up).

The Supreme Court first announced this exception in *New York v. Quarles*. There, the Court held there is a "public safety exception to the *per se* rule barring admission of statements made without *Miranda* warnings." *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (discussing *Quarles*). It is a "narrow" exception" permitting "questions reasonably prompted by a concern for the public safety." *Id.* at 152; *see also Quarles*, 467 U.S. at 657 (noting that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"). The questions "may not be investigatory in nature or 'designed solely to elicit testimonial evidence from a suspect.'" *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (quoting *Quarles*, 467 U.S. at 658–59). But courts do not expect officers to tailor questions perfectly. *Newton*, 369 F.3d at 678 ("Courts recognize that

public safety questions are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such circumstances.").

Thus, the standard applicable to this exception is a flexible one: while the Second Circuit does not "condone[] the pre-*Miranda* questioning of suspects as a routine matter[,]" it recognizes the need for "flexibility in situations where the safety of the public and the officers are at risk[.]" *Estrada*, 430 F.3d at 612 (quoting *Reyes*, 353 F.3d at 155).

Case law, including *Quarles*, focuses on the immediacy of the threat to public or officer safety and information law enforcement has, which may "increase[] the probability" of a gun being present. *United States v. Ferguson*, 702 F.3d 89, 95 (2d Cir. 2012). The *Ferguson* case lays out additional factors for the Court to consider:

- Do the objective facts suggest that the questioning was "a subterfuge … designed solely to elicit testimony?" *Id*. at 94 (citation omitted) (quoting *Estrada*, 430 F.3d at 613).[8]

- Was the question one routinely put to arrested suspects, or did the question arise from "an objectively reasonable need to protect" against a concrete danger. *Id*. (quoting *Estrada*, 430 F.3d at 613).

Applying these factors in *Estrada*, the Second Circuit held that the public safety exception applied to statements made by a defendant who had been previously convicted of assault and was suspected of having a gun

_____

[8] None of the testimony at the hearing suggested that the deputy's questioning was a subterfuge. Nor do the government's exhibits suggest subterfuge. I therefore do not discuss this factor further.

while the police were standing over him and attempting to arrest him. *See Estrada*, 430 F.3d at 608.

### I find that the public safety exception does not apply.

The key here is that USMS had no immediate reason to believe that Singletary had a gun or posed a danger. I do not accept the government's invocation of the public safety exception because the Second Circuit has consistently required advance or contemporaneous notice of danger.

True, the deputy marshals arresting Singletary knew a great deal about him. But *Quarles* and its progeny require that the arresting officers have some specific information so that their "questioning" relates "to an objectively reasonable need to protect the police or the public from any *immediate* danger." *Newton*, 369 F.3d at 677 (emphasis added). Based on applicable case law and the materials I have reviewed, I find that the public safety exception does not apply.

### I find that the public safety exception should not apply for several independent reasons, considering *Quarles* and its Second Circuit progeny.

I find that the public safety exception does not apply for several independent reasons:

- Singletary was not resisting arrest. (Tr. 48:1–8; *see also* Tr. 85:8–13 (state Task Force officer at the scene noted that "we took [Singletary] into custody without incident").) One deputy marshal stated that Singletary did not "resist either passively or aggressively." (Tr. 48:6–8.) While Exhibit 1 records events only after Singletary's arrest, it indicates the same. In Exhibit 1, while he is talkative, Singletary is

entirely compliant with USMS deputies and other task force officers.

- Based on hearing testimony, I conclude that Singletary was handcuffed at the time the deputy asked if he had anything on him. (Tr. 73:18–23; *see also* Tr. 29:19–22, 31:9–10.) Likewise, Exhibit 1 shows that Singletary was handcuffed when USMS deputies asked him other incriminating questions.

- No USMS deputy testified that Singletary had done anything suspicious when they were arresting him. Instead, the deputies simply indicated they were following protocol in asking questions like "do you have anything on you." (Tr. 62:15–16, 64:11–17; *see also* Tr. 32:25–33:6 ("We typically don't *Mirandaize* individuals that we apprehend through fugitive investigations. We're not there to collect evidence … So, asking questions if they have anything on their person that might cause harm to them or us is sort of standard procedure when effecting an arrest and is something that is taught to us during our basic academy.").) As discussed, the more routine a question, the less likely that the public safety exception applies. *Cf. Ferguson*, 702 F.3d at 94 (noting that the questions of the defendant in that case "were not routinely put to arrested suspects … but rather were supported 'by an objectively reasonable need to protect' against a perceived danger" (citation omitted) (quoting *Estrada*, 430 F.3d at 613)).

- USMS deputies were arresting Singletary not for a weapons-related charge or a drug charge, but because of a violation of supervised release. The USMS deputies discuss as much with Singletary in Exhibit 1.

Because the officers had no reason to suspect immediate danger, I find that the government has failed to meet its burden of showing an exception to *Miranda*.

I find the government has not met its burden because every case on the issue, including those on which the government relies, requires

information suggesting that the defendant *possesses* a weapon or dangerous object. This distinguishes cases like *Quarles*, *Ferguson*, and *Estrada*, not to mention the case the government has repeatedly cited, *United States v. Whitaker*, 827 F. App'x 39 (2d Cir. 2020). In *Whitaker*, unlike here, the Court noted that the defendant acted suspiciously while being arrested by reaching "for his waistband" while being arrested for alleged drug offenses. *Id.* at 43. The Second Circuit also noted that the defendant in that case "was not fully restrained at the time he was asked if he had anything on him." *Id. Whitaker* and other public safety exception cases are plainly inapposite.

United States v. Miller* is helpful in showing that general safety concerns are not enough. 281 F. Supp. 3d 330 (E.D.N.Y. 2017). That court stayed true to the public safety exception being a "narrow" exception. There, the Court did not accept the government's "generalizations about the type of drug conspiracy involved[.]" *Id.* at 334. The Court noted that "the Second Circuit has consistently required advance or contemporaneous notice of danger separate and apart from the drug conspiracy itself." *Id.* at 334 (collecting cases).

So too here—the government cannot rely on a broadbrush portrayal of Singletary as volatile. In *Miller*, the Court found that the bare allegation of a drug conspiracy was not enough for law enforcement to invoke the public safety exception: "Here," the Court noted, "the

27

Government has not presented any evidence of danger other than generalizations about the type of drug conspiracy involved, and under these circumstances where Defendant was compliant and laying prone on the ground at gunpoint, the 'narrow' public safety exception is inapplicable." *Id.* at 334–35 (citations omitted). This case presents a scenario even farther removed from the public safety exception. USMS arrested Singletary not on allegations of a drug conspiracy, but for violating the terms of his supervised release by skipping mandatory appointments. Based on case law, I am certainly persuaded that the public safety exception does not apply.

Considering my finding that the public safety exception does not apply, I find the following questions that law enforcement asked Singletary inadmissible because they are reasonably likely to elicit an incriminating response:

- Officers ask Singletary if there are just two guns. Singletary replies, "yeah, bro."

- Later, an officer asks Singletary if the guns are loaded. Singletary says yes, "one of them is loaded." The officer then asks if there is a round in the chamber. Singletary states: "No. I don't keep shit in the chamber."

- I find below that Singletary voluntarily states that he is "fucked." However, one officer asks Singletary, "why are you saying you're so fucked." Singletary replies: "Bro there's two guns in that bag, bro." That specific question and response are inadmissible because, on its face, it "expand[ed] the scope of [the] volunteered statement[]." *See United States v. Rommy*, 506 F.3d 108, 133–34 (2d Cir. 2007). This was not a clarifying question. *See id.* (answer

to law enforcement's follow-up question "volunteered only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made" (quoting 2 Crim. Proc. § 6.7(d) (4th ed.))).[9]

- About another bag in Singletary's possession, the officer asks, "what's in here?" Singletary responds that the bag has shoes and clothes only.

- Finally, when the USMS deputies are putting Singletary in a vehicle for transport, they ask him, "you got nothing else, right." Singletary indicates he has nothing else on him.

I have reviewed Exhibit 1 and find that **only** these questions discussed above should not be admitted because Singletary responded to them without being *Mirandized*. Singletary was in custody, and these questions were ones that the officers should have known were "reasonably likely to elicit an incriminating response." *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987). These questions garnered answers that incriminated Singletary and further showed his knowing possession of firearms. As I discuss below, the remainder of Singletary's statements are fair game as "volunteered, spontaneous statements." *United States v. Smalls*, 719 F. App'x 83, 85 (2d Cir. 2018), *as amended* (Apr. 20, 2018).

---

[9] This treatise entry, at footnote 169, collects supporting cases.

**While law enforcement knew Singletary was volatile, this is not enough for application of the public policy exception.**

In reporting and recommending suppression, I do not discount what USMS and state law enforcement knew when they arrested Singletary. I find only that—under the law—it was not enough to trigger the public safety exception. To hold otherwise would invite un-*Mirandized* questioning of suspects law enforcement deems "volatile."

Here, the Task Force officers knew that Singletary had failed to appear for mandatory mental health treatment and was convicted of brandishing a firearm.[10] (Tr. 21:1–12; *see also* Tr. 42:1–9; 54:23–55:5.) Officers were also aware that Singletary is prone to violent outbursts. (Tr. 23:23–24:2 (noting that Singletary is "prone to show some violent behavior and threaten violence").) The officers noted, however, that upon being arrested Singletary was compliant and their questioning of him was routine.

Allowing law enforcement to label a defendant "volatile" or "prone to show some violent behavior" and then holding that that is enough to

_____

[10] The government would like me to make more of the fact that Singletary pled guilty to a weapons-related charge. But the reason USMS and state Task Force officers were arresting Singletary was a warrant related to his supervised release for failure to appear for mandatory mental health treatment, among other failures to appear. USMS deputies tell Singletary as much at the scene. (Ex. 1.) And the weapons conviction is one step removed from why officers were arresting Singletary. So, while this conviction may be relevant, it does not overcome the countervailing reasons for which suppression is warranted here under *Quarles* and related Second Circuit cases.

overcome *Miranda* cuts sharply against the public safety exemption being a narrow one. Applying the public safety exception to every suspect based on their quality of being volatile—or what is "routine" for law enforcement to do—would create open season for law enforcement to stretch what the public exception covers. *Cf. Estrada*, 430 F.3d at 614 (noting that the public safety exception "must not 'be distorted into a *per se* rule as to questioning people in custody'" (citation and internal quotation marks omitted) (quoting *Reyes*, 353 F.3d at 155)). So, I reject the government's position broadly—and as it applies to this case.

### *The balance of Singletary's statements made to law enforcement were voluntary and spontaneous.*

While I recommend suppression of USMS deputies' "express questioning" of Singletary, the balance of Singletary's statements are voluntary and spontaneous. *Smalls*, 719 F. App'x 83, 85 (2d Cir. 2018) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). Singletary made many statements that are admissible because they were "given freely and voluntarily without any compelling influence." *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970) (quoting *Miranda*, 384 U.S. 436 at 478). These statements include:

- Singletary's repeated comment that he is "fucked" and "I am fucked, bro, I am so fucked."

- Singletary questioning officers: "How'd y'all know I was here?"

- Singletary stating "why y'all lookin' at me why I got the guns … peoples trying to kill me." "I'm just trying to be safe … nigger tried to kill me."

- Singletary positing that someone must have "talked" to USMS or other law enforcement about his return.

- Singletary bemoaning the fact that he only violated his release conditions.

Exhibit 1 shows that statements like these were voluntary. I report and recommend that Singletary's motion to suppress be denied as to these statements.

## CONCLUSION

Based on the foregoing, I report and recommend that the Hon. Frank P. Geraci, Jr., Senior District Judge, **DENY** Singletary's motion for suppression of evidence, **DENY** Singletary's motion to dismiss his indictment, and **GRANT IN PART and DENY IN PART** his motion to suppress statements.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

Dated:          May 20, 2024
                  Rochester, NY

_____
MARK W. PEDERSEN
United States Magistrate Judge