UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                                          Case # 23-CR-6134

                                                                            DECISION AND ORDER

APPRENTIACE SINGLETARY,
                                              Defendant.

## INTRODUCTION

On May 20, 2024, Magistrate Judge Mark W. Pedersen filed a Report & Recommendation ("R&R"), ECF No. 51, in which he recommended denying Defendant Apprentiace Singletary's motion to dismiss the indictment and motion to suppress evidence, but recommended granting in part Defendant's motion to suppress statements.  *See* ECF No. 32.  Defendant has filed his objection to the R&R, ECF No. 55, and the government has submitted its response.  ECF No. 59. For the reasons that follow, the R&R is ADOPTED IN PART, Defendant's motion to dismiss the indictment is DENIED, his motion to suppress evidence is DENIED, and his motion to suppress statements is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

A district court reviews those portions of an R&R to which a party has timely objected *de novo*.  Fed. R. Crim. P. 59(b)(3).  When a party does not object to a portion of an R&R, or when the objections are conclusory, general, or without legal support, a district court reviews those portions for clear error.  *See United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009).

After reviewing the R&R and the objections thereto, a district court "may accept, reject, or modify the recommendation."  Fed. R. Crim. P. 59(b)(3).  In addition, "[t]he Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility

findings." *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013); *see also Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008).

## DISCUSSION

### I.   **Motion to Dismiss the Indictment**

Defendant is charged in a one-count indictment with being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1).[1]  ECF No. 15.  He moves to dismiss the indictment on the theory that Section 922(g)(1) "is unconstitutional in that it improperly infringes on his Second Amendment rights."  ECF No. 32-1 at 2.  The magistrate judge rejected Defendant's facial constitutional challenge.  ECF No. 51 at 8-16.  Defendant objects to the magistrate judge's recommendation.  ECF No. 55 at 6-7.

The Court overrules the objection.  In the seminal Second Amendment cases of *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court made clear that the standards it announced did not "cast doubt on longstanding prohibitions on the possession of firearms by felons."  *Heller*, 554 U.S. at 626; *see also McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill . . . .  We repeat those assurances here.").  Taking these assurances at face value, the Second Circuit has rejected the argument that Section 922(g)(1) "violates [a defendant's] Second Amendment right to keep and bear arms."  *United States v. Bogle*, 717 F.3d 281, 281 (2d Cir. 2013) (per curiam).

As a district court within the Second Circuit, this Court is required to follow *Bogle* "unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent

---

[1] Defendant was previously convicted in the Western District of New York for brandishing a firearm during and in relation to a drug trafficking crime.  *See* No. 14-CR-6032, ECF No. 93.

decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (internal quotation marks omitted).  The Second Circuit has not overruled *Bogle* but has instead repeatedly reaffirmed its holding. *See United States v. Brillon*, No. 22-2956-cr, 2024 WL 392949, at *1 (2d Cir. Feb. 2, 2024); *Johnson El v. Chambers*, No. 20-3377, 2021 WL 4484929, at *2 (2d Cir. Oct. 1, 2021) (summary order) ("The Supreme Court has clearly stated that prohibitions on the possession of firearms by felons do not violate the Second Amendment." (internal quotation marks omitted)); *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018).  Likewise, subsequent Supreme Court decisions have not undermined *Bogle*'s view of *Heller* and *McDonald*.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court reaffirmed *Heller* and *McDonald* in the course of clarifying the specific standards to be applied for Second Amendment claims. *See Bruen*, 597 U.S. at 9.  And in the recent case of *United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024), the Supreme Court favorably quoted *Heller*'s statement on firearm restrictions for felons. *See Rahimi*, 2024 WL 3074728, at *10.

Therefore, while there is certainly active debate regarding the constitutionality of Section 922(g)(1) in light of *Bruen*, *see United States v. Chaney*, No. 23-CR-451, 2024 WL 2293759, at *3 (E.D.N.Y. May 21, 2024) (collecting cases and noting the "deep divide among courts analyzing Section 922(g)(1) after *Bruen*"), this Court cannot conclude that the Supreme Court's recent decisions in *Bruen* and *Rahimi* so undermine *Bogle* "that it will almost inevitably be overruled." *Diaz*, 122 F. Supp. 3d at 179.  As a result, this Court must follow *Bogle* and reject Defendant's facial constitutional challenge to Section 922(g)(1). *See Bogle*, 717 F.3d at 281-82 ("§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons.").

The magistrate judge's recommendation is ADOPTED, and Defendant's motion to dismiss is DENIED.

## II.   Motions to Suppress

### a.   Background[2]

On November 10, 2022, this Court issued a warrant for Defendant's arrest due to a violation of his supervised release.  ECF No. 44 at 21.  Defendant does not contest the validity of the warrant itself.  A task force was assembled to execute the warrant.

During the investigation into Defendant's whereabouts, the task force learned that Defendant was residing in Georgia but intended to return to Rochester via a Greyhound Bus.  *Id.* at 26.  Greyhound confirmed that a bus ticket from Georgia to Rochester had been purchased in Defendant's name; the bus would be arriving on February 8, 2023, "sometime after 5 a.m."  *Id.* at 26-27.  By cross-referencing that information with the bus schedule, the team determined that Defendant would be arriving on Greyhound Bus 256.  *Id.* at 27.

On the morning of February 8, 2023, Deputy U.S. Marshal Ryan Spain and the rest of the team set up surveillance at the bus station, which was located near Clinton Avenue and Cumberland Street in Rochester.  *Id.*  At some point, Deputy U.S. Marshal Michael Daly relayed over radio that the Greyhound Bus 256 had arrived and that "an individual roughly matching the physical description of [Defendant]" exited the bus.  *Id.* at 28-29, 46.  Deputy U.S. Marshal Chad Eaton also observed an individual matching Defendant's physical description—"approximately five foot ten, 170 pounds, African-American"—get off the bus.  *Id.* at 59.  Deputy Eaton was familiar with Defendant's appearance, having transported him to court and interacted with him

---

[2] These facts are drawn from the evidence submitted at the suppression hearing, unless otherwise noted.  The Court declines to credit Defendant's self-serving affidavit over the live testimony of the witnesses.  *See* ECF No. 34; *see also United States v. Clark*, 600 F. Supp. 3d 251, 264-65 (W.D.N.Y. 2022) ("The self-serving affidavit of the moving defendant is usually disregarded if []he declines to testify at the hearing." (internal brackets omitted)).

several times at the courthouse.  ECF No. 44 at 56.  He testified that none of the other people who

exited the bus "peaked my interest or led me to believe that they could be [Defendant]." *Id.* at 59.

Members of the task force had "eyes on [this individual] . . . at all points prior to" the arrest.

*Id.* at 46.  The individual obtained some bags from the bus, and "stood around the curb for a little

bit," before entering the nearby train station.  *Id.* at 46.  New York State Trooper Eric Salamone,

another member of the task force, followed the individual into the train station.  *Id.* at 47.  After

the individual exited the train station, Deputy Spain observed him walking southbound on Clinton

Avenue in the direction of Cumberland Street.  *Id.* at 29.  Deputy Spain testified that the person he

believed to be Defendant was "wearing a black puffy winter coat and a "black face mask or face

covering," and was carrying "three bags over [his] shoulders."  *Id.*  Deputy Spain was familiar

with Defendant and his appearance, having been involved in two prior arrests of Defendant and

having interacted with him at the federal courthouse.  *See id.* at 23-25.  Deputy Spain described

his initial interaction with Defendant:

> [M]yself and another deputy that was in my vehicle, we were the first ones to step
> out and approach this individual to identify [him]. . . .  We asked the individual to
> see their hands and we placed their hands behind their back at first and then
> removed the face mask and after identifying them as [Defendant], we placed him
> into handcuffs.

*Id.* at 30.  Deputy Eaton arrived seconds after Defendant was placed into handcuffs.  *Id.* at 63.

Deputy Eaton asked Defendant "if he had . . . any weapons on him or anything on him."[3]  *Id.* at

32, 63.  Deputy Eaton did not provide any *Miranda* warnings prior to asking Defendant that

question.  *Id.* at 65.  Defendant stated that he "had firearms in a bag that was around his shoulders."

*Id.* at 32.  A search of the bag revealed two 9mm handguns and two empty extended magazines.

*Id.* at 33.

---

[3] Deputy Spain testified that, regardless of Defendant's response to Deputy Eaton's question, Defendant's bag would have been searched as part of the standard operating procedure for effecting his arrest.  ECF No. 44 at 35-36.

During the approximately twenty minutes that Defendant was awaiting transportation away from the scene after his apprehension, *see* ECF No. 44 at 88, he made various inculpatory statements. Many of these statements were captured by the body-worn camera of Deputy Monroe County Sheriff Clay Hillegeer—another member of the task force.[4] The Court discusses the substance of Defendant's statements below.

### b.  Discussion

#### i.  Motion to Suppress Evidence

Defendant argues that initial stop was constitutionally infirm because police lacked "reasonable suspicion that the person stopped was [] Defendant."[5] ECF No. 47 at 7; *see also* ECF No. 55 at 11. The magistrate judge rejected Defendant's motion on the ground that the Fourth Amendment does not require officers to confirm a suspect's identity "before arresting [him]." ECF No. 51 at 19. The Court agrees that suppression is not warranted under these circumstances, though it reaches this conclusion on a different ground than that articulated by the magistrate judge.

Consistent with the Fourth Amendment, police have the authority to "make a *forcible* stop of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702 (1983). This authority permits police to briefly detain a person where there is reasonable suspicion to believe that the person is named in a valid arrest warrant. *See, e.g.*, *United States v. Gilliam*, 520

---

[4] The footage was admitted at the hearing as Government Exhibit 1. ECF No. 44 at 92.

[5] Originally, Defendant argued that his initial seizure was a "*de facto* arrest" requiring "probable cause." ECF No. 32-1 at 9. In subsequent briefing, however, Defendant presses only the theory that his initial seizure was an illegal *stop* effectuated without reasonable suspicion. *See* ECF Nos. 47, 48, 55. Accordingly, the Court deems Defendant's original argument abandoned and/or waived. *See United States v. Stegemann*, 701 F. App'x 35, 38 (2d Cir. 2017) (summary order); *see also* Loc. R. Crim. P. 59(c)(2) ("Written objections to proposed findings of fact and recommendations for disposition submitted by a Magistrate Judge . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority.").

F.3d 844, 846-47 (8th Cir. 2008) (concluding that police had reasonable suspicion to briefly detain an individual to determine whether he was "the person named in the arrest warrant"); *United States v. Crapser*, 472 F.3d 1141, 1147 (9th Cir. 2007); *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005); *United States v. Washington*, No. 200101360, 2005 WL 1800119, at *4 (N-M. Ct. Crim. App. July 29, 2005). Reasonable suspicion "requires more than a hunch." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal quotation marks omitted). "[I]t demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Id.* (internal citations and quotation marks omitted). "The standard is not high." *Id.* (internal quotation marks omitted).

Here, officers had reasonable suspicion to detain Defendant to determine his identity. Contrary to Defendant's argument, ECF No. 55 at 9, this is not a case where a suspect was detained "simply because [he was] black, or [] because [he was] coincidentally seen at a location of suspected criminal activity." *Id.* at 335. The task force had information that Defendant would be arriving on the Greyhound Bus 256, and a person whose physical appearance matched that of Defendant exited the Greyhound Bus 256 at the expected time. *See United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (officers had reasonable suspicion to extend consensual encounter with individuals where, *inter alia*, (1) the individuals "were encountered in front of the address at which [the suspects named in the arrest warrants] were expected at that time," and (2) "they matched the general description provided to the agents"). Importantly, task force officers were not simply assessing potential suspects based on generic physical descriptions, but based on their *personal* acquaintance and familiarity with Defendant. Because Deputies Eaton and Spain had actual knowledge of Defendant's build and appearance, they cannot be accused of relying on

"vague description[s]" to target Defendant.  ECF No. 55 at 11; *cf. Bennett v. Vidal*, 267 F. Supp. 3d 487, 495-96 (S.D.N.Y. 2017) (distinguishing between reliance on a "generic radio description to arrest [a suspect]" and an officer's "own [prior] observation[s]" of a suspect).  Furthermore, Deputy Eaton testified that no one else who exited the bus shared a similar physical appearance. *Cf. United States v. Quinn*, 812 F.3d 694, 699 (8th Cir. 2016) (noting that "generic suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description").

These combination of circumstances "provided an articulable basis (*i.e.*, more than a mere hunch) to suspect that" that the individual with the face mask was Defendant.  *Bailey*, 743 F.3d at 333.  Defendant was not only "in the right place at the right time but also fit the suspect['s] description[]."  *United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003).  Accordingly, task-force members were permitted to briefly detain Defendant to confirm his identity.  *See United States v. Hensley*, 469 U.S. 221, 229 (1985) (stating that, in order to "locate a person suspected of involvement in a past crime," police have the authority to "briefly stop the person, ask questions, or check identification").

Defendant's motion to suppress on the basis that officers lacked reasonable suspicion to conduct the stop is DENIED.

### c.  Motion to Suppress Statements

Defendant made a number of inculpatory statements after he was placed under arrest outside of the bus station.  The magistrate judge placed these statements into three categories, which the Court addresses below.[6]

---

[6] Because Defendant does not contend that the magistrate judge overlooked or failed to analyze any other statements that he seeks to have suppressed, the Court confines itself to the statements identified by the magistrate judge.

### i. Questioning Regarding Bags & Person

The first set of statements were elicited in connection with the search of Defendant's bags and person after his arrest.  This includes Defendant's statement that he had "firearms" in one of his bags, made in response to Deputy Eaton's question concerning whether Defendant "had . . . any weapons on him or anything on him."  ECF No. 44 at 32, 63.  Other, similar questions were also asked of Defendant at the scene:

- Officers ask Singletary if there are just two guns. Singletary replies, "yeah, bro."

- Later, an officer asks Singletary if the guns are loaded. Singletary says yes, "one of them is loaded." The officer then asks if there is a round in the chamber. Singletary states: "No. I don't keep shit in the chamber." . . . .

- About another bag in Singletary's possession, the officer asks, "what's in here?" Singletary responds that the bag has shoes and clothes only.

- Finally, when the USMS deputies are putting Singletary in a vehicle for transport, they ask him, "you got nothing else, right." Singletary indicates he has nothing else on him.

ECF No. 51 at 28-29.  The government does not dispute that Defendant did not receive *Miranda* warnings prior to this questioning.  *See* ECF No. 35 at 8-9.  Instead, the government contends that such questioning falls within the "public safety exception" to the *Miranda* rule.  *Id.*  The magistrate judge concluded that the public safety exception did not apply.  *See* ECF No. 51 at 25-29.

Having considered the briefing and reviewed the transcript and body-worn camera footage, the Court concludes that the public safety exception applies to these statements.

"Although statements made by a suspect in custody in response to police interrogation are typically inadmissible unless preceded by *Miranda* warnings, the Supreme Court has recognized a 'public safety' exception to that rule." *United States v. Estrada*, 430 F.3d 606, 610 (2d Cir. 2005) (internal citation omitted).  Under this exception, "*Miranda* warnings need not precede questions

9

reasonably prompted by a concern for the public safety or for the safety of the arresting officers." *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (internal quotation marks omitted).

The Second Circuit has articulated three principles that district courts should consider when applying this exception.  First, "*Miranda* warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of the arresting officers, so long as the questioning relates to an *objectively* reasonable need to protect the police or the public from any immediate danger." *Estrada*, 430 F.3d at 612 (internal quotation marks and brackets omitted).  Second, "the exception is limited by the fact that pre-*Miranda* questions, while framed spontaneously in dangerous situations, may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect." *Id.* (internal quotation marks and citation omitted).  Third, "pre-*Miranda* questioning of suspects as a routine matter" is not favored. *Id.*  But given the need for "flexibility in situations where the safety of the public and the officers are at risk," the exception must be applied in light of "the totality of the circumstances." *Id.*

Importantly, the public safety exception is not solely focused on a suspect's continued dangerousness, but is instead concerned more generally with "the public safety" and "the safety of the arresting officers." *Id.*  Those issues will routinely overlap, of course.  *See, e.g.*, *Reyes*, 353 F.3d at 150 (arresting officer permitted to ask arrestee if "he had anything on him that could hurt the officer," where officer reasonably believed that arrestee had a firearm on his person, and arrestee was not yet handcuffed and could have reached for it (internal brackets omitted)).  But they are analytically distinct.  That distinction is why courts regularly invoke the exception even where an arrestee has been fully subdued and thus cannot *himself* pose a danger to others.  In other words, regardless of an arrestee's continued dangerousness, the exception may apply so long as police are seeking to remedy an existing safety risk. *See, e.g.*, *New York v. Quarles*, 467 U.S. 649,

657 (2005) (where arrestee was handcuffed and surrounded by four officers at a grocery store, permitting officer to ask arrestee where the gun was located because "a customer or employee might later come upon it"); *United States v. Ferguson*, 702 F.3d 89, 95 (2d Cir. 2012) (officer's questions regarding location of missing gun came within public safety exception, notwithstanding that suspect had been arrested and taken to police precinct an hour before questioning); *see also United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004) (rejecting the argument that the public safety exception cannot apply where an arrestee is "handcuffed when the challenged questions [are] asked").

One situation in which a reasonable safety concern may arise is an officer's search of a suspect's person or property.  When an officer is entitled to conduct a lawful search of person or property, it is "logical and important to permit" the officer to ask questions "designed to prevent [him] from hurting [himself] during [the] search."  *United States v. Hernandez*, 751 F.3d 538, 541 (7th Cir. 2014).  As the Seventh Circuit observed, this is true regardless of the suspect's continued dangerousness:

> While firearms on a suspect's person or in close proximity to him can be lunged for and used to harm an officer, sharp and bio-hazardous objects pose a great risk to officers regardless of any action by the suspect. Accordingly, a search of his person and items in close proximity is necessary, and a question about what an item on his person contains is a narrow, practical way of ensuring officer safety during the immediate and inevitable search of the item. This is true whether the item is the clothes the suspect is wearing or something that he is carrying—especially when there are circumstances that suggest the possible presence of a hazard. A question about what such an item contains is circumscribed by the exigency which justifies it, necessary to secure the officer's own safety.

*Id.* (internal quotation marks, citation, and brackets omitted); *see also Reyes*, 353 F.3d at 154 (recognizing that a "loaded gun [] could accidentally be discharged during a search" of a person); *United States v. Williams*, 181 F.3d 945, 954 (8th Cir. 1999) (same with respect to search of apartment).

*Estrada*'s three principles militate in favor of the exception under the facts presented here. First, as just noted, the questioning regarding the contents of Defendant's bags "relate[d] to an objectively reasonable need to . . . secure the safety of police officers." *Estrada*, 430 F.3d at 612 (internal quotation marks, emphasis, and brackets omitted).  Defendant had originally been convicted with brandishing a firearm in furtherance of a drug trafficking crime.  ECF No. 44 at 22; *see also Estrada*, 430 F.3d at 612 (suspect's prior convictions for misdemeanor and felony assault justified questioning); *Williams*, 181 F.3d at 954 n.14 (prior weapons possession charge provided basis for officers' belief that suspect "may have possessed a gun" in the apartment).  Defendant has a history of drug use and drug trafficking.  *See* No. 14-CR-6032, ECF Nos. 98, 144; *see also Reyes*, 353 F.3d at 154 (arresting officer had reasonable belief that "professional seller of heroin" may have "sharp objects or a firearm on his person," and noting that "firearms and sharp objects . . . are 'tools of the [drug] trade' regularly found on narcotics traffickers").  Defendant had previously been accused of violating his supervised release in connection with several domestic violence incidents, during which he tried to kick down a door to an apartment, threatened to kill an individual while claiming to have a firearm, and punched an individual after following the individual to her car and directing her to drive to another location.  ECF No. 44 at 24-25, 43; *see also* No. 14-CR-6032, ECF No. 132 at 2.  And Defendant could be volatile: he was restrained on several occasions during court visits and had made threatening statements to others.  *See* ECF No. 44 at 68.

In combination, these facts gave officers a "solid basis" to question Defendant regarding the contents of his bags and person.  *Reyes*, 353 F.3d at 154.  As Deputy Eaton testified, such questioning ensures the safety of officers, the suspect, and the public, because it allows officers to "handle[] [the firearm or knife or drugs] properly."  ECF No. 44 at 34; *see also Hernandez*, 751

12

F.3d at 542 (noting that grabbing or opening a bag without questioning "would place the officers at risk of harm (impalement on a heroin needle or bumping a loaded gun)").

Second, the Court cannot conclude that the questioning was "designed solely to elicit testimonial evidence from a suspect." *Estrada*, 430 F.3d at 612. On this issue, a critical point is that Defendant does not dispute that the officers were permitted to search his bags after his arrest.[7] As a result, the task force would "learn soon enough whether" Defendant's bags contained weapons or other contraband. *United States v. Lackey*, 334 F.3d 1224, 1228 (10th Cir. 2003). In that situation, the purpose of the questioning is manifestly "not to acquire incriminating evidence" but to "protect the officers . . . from physical injury." *Id.*; *see also Reyes*, 353 F.3d at 153 (quoting *Lackey* approvingly and noting that such questioning creates "little risk of incrimination because the officers would have inevitably uncovered any firearms . . . during a search incident to [the suspect's] arrest").

Third, though Deputy Spain testified that such questioning is "standard procedure," ECF No. 44 at 34, the Court does not find the "routine" nature of the questions salient. *See Estrada*, 430 F.3d at 612. The question may be routine, but so is the risk of harm whenever an officer searches the bag or person of an arrestee with a history of drug trafficking, drug use, or unlawful firearm possession. That consideration does not so outweigh the "totality of the circumstances" that otherwise justify the limited questioning regarding Defendant's bags and person. *Id.*; *see also United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (applying public safety exception to questions asked "as a matter of policy"); *Reyes*, 353 F.3d at 153 (citing *Carrillo* favorably).

Accordingly, the Court concludes that the public safety exception applies to this set of statements—*i.e.*, responses to questions regarding the search of Defendant's bags or person.

---

[7] As stated above, Defendant challenges only the validity of the stop, not his subsequent arrest or officers' post-arrest search of his bags.

13

## ii. Defendant's Spontaneous Statements

After he was arrested, Defendant repeatedly yelled expletives and made other inculpatory statements.  The magistrate judge identified the following statements:

- Singletary's repeated comment that he is "fucked" and "I am fucked, bro, I am so fucked."

- Singletary questioning officers: "How'd y'all know I was here?"

- Singletary stating "why y'all lookin' at me why I got the guns … peoples trying to kill me." "I'm just trying to be safe … [a person] tried to kill me."

- Singletary positing that someone must have "talked" to USMS or other law enforcement about his return.

- Singletary bemoaning the fact that he only violated his release conditions.

*Id.* at 31-32.  The magistrate judge concluded that these statements should not be suppressed because they were "voluntary and spontaneous."  ECF No. 51 at 31.  Defendant objects to the admission of these statements.  ECF No. 55 at 11-12.  He argues that his statements were involuntary because of the "overwhelming police presence" and the officers' awareness that Defendant "[had a] penchant for being talkative."  *Id.* at 11-12.

Having reviewed the body-worn camera footage, the Court agrees with the magistrate judge.  A statement that is "given freely and voluntarily without any compelling influence" is admissible notwithstanding the absence of *Miranda* warnings.  *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970).  This includes a suspect's "spontaneous utterance[s]" that are not the result of "police interrogation."  *Id.*  The body-worn camera footage confirms that Defendant "blurted" out the statements at issue voluntarily.  *Isasi v. Herbert*, 176 F. App'x 143, 145 (2d Cir. 2006) (summary order).  Defendant's contrary arguments are not persuasive.  "The mere fact of police presence" does not constitute police interrogation.  *Id.* (internal quotation marks omitted).  And the fact that Defendant has a "penchant for being talkative" does not render his statements

involuntary, ECF No. 55 at 12—at least absent any claim of police coercion or manipulation.  *Cf.*
*Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The sole concern of the Fifth Amendment, on
which *Miranda* was based, is governmental coercion."); *Harris v. Woods*, No. 05-CV-5582, 2006
WL 1140888, at *32 (S.D.N.Y. May 1, 2006) (collecting cases and noting that a suspect's
infirmities are not a basis for suppression under *Miranda* absent "coercive police activity").

Therefore, these statements are not subject to suppression under *Miranda*.

### iii.  Deputy Hillegeer's Question

At one point after Defendant's arrest, Defendant exclaims, "I'm so fucked."[8]  Deputy
Hillegeer asks, "Why are you saying you're so fucked?"  Defendant responds, "Bro there's two
guns in that bag, bro."  Deputy Hillegeer states, "Dude, people are getting out with guns all the
time."  Defendant replies, "Bro, not me [] I got the worst luck in the world."  Deputy Hillegeer
states that Defendant should not say he is "fucked," to which Defendant responds that he is
"fucked."

The magistrate judge concluded that Defendant's responsive statements during this
exchange should be excluded, reasoning that they did not come within the public safety exception.
Moreover, because they were elicited through Deputy Hillegeer's questioning, the statements
could not be considered voluntary or spontaneous.  ECF No. 51 at 28-29.  The Court agrees.  There
was no evidence presented at the hearing that, with respect to this exchange, Deputy Hillegeer
spoke to Defendant out of any safety concern.  *See Reyes*, 353 F.3d at 152.  Rather, because they
were the result of Deputy Hillegeer's direct question and statements to Defendant—as opposed to
Defendant's spontaneous choice—Defendant's statements must be considered the product of
police interrogation.  *See Isasi*, 176 F. App'x at 144.  And while Defendant's initial expletive that

---

[8] The exchange begins at 6:17:28 of the body-worn camera footage.

set off this discussion was voluntary and spontaneous, Deputy Hillegeer's clarifying question impermissibly expanded the scope of the volunteered statement. *See United States v. Rommy*, 506 F.3d 108, 133-34 (2d Cir. 2007) (stating that, although an officer's "simple clarifying questions do not necessarily constitute interrogation" where a person in custody "volunteers incriminating information to the police," a question that "seek[s] to expand the scope of the volunteered statements" may implicate *Miranda* (internal quotation marks omitted)).

Therefore, Defendant's responsive statements during this exchange must be suppressed. *See United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) ("Absent a warning, the prosecution may not use a statement elicited by the police during a custodial interrogation.").

## CONCLUSION

For the foregoing reasons, the Court ADOPTS IN PART Magistrate Judge Pedersen's R&R (ECF No. 51).  Defendant's motion to dismiss the indictment is DENIED, his motion to suppress evidence is DENIED, and his motion to suppress statements is GRANTED IN PART and DENIED IN PART as set forth herein.  *See* ECF No. 32.

IT IS SO ORDERED.

Dated: July 15, 2024
         Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

16